of Laredo and Laredo Physicians Group v. Dr. Richard Cigarroa, Cigarroa Heart and Vascular Institute, Laredo, Texas Hospital Company. Council, no rush but whenever you're ready. May it please the court, Luke Schamel for Plaintiffs. Antitrust law can be complex. What I hope to show today is that there's a narrow and straightforward way to resolve this case on some very discreet legal issues. Now the District Court here made three simple but critical legal errors. First on Plaintiff's Section 2 attempted monopolization claim, it required proof of actual anti-competitive effects when only potential effects were required. That was error. Second on Plaintiff's Section 1 conspiracy claim, it declined to apply the per se rule to a group boycott among admitted competitors because the conspiracy also happened to involve some vertical elements. And the District Court determined that the vertical elements were more important. Failure to apply the per se rule in this situation was also error. Third, because the District Court found there was no antitrust violation, it said there was no antitrust injury, that mistakes the merits for standing and in any event, resolves itself as essentially moot if this court reverses on either of Plaintiff's claims. We therefore ask this court to reverse and remand for trial on both claims. Now, I had mentioned that there's a narrow path here. And I think this appeal can be resolved on these three discreet issues I mentioned, which are based on well-established antitrust principles in law and binding precedent in this court. If the court does that, there's going to be no need to look at anti-competitive effects, direct versus indirect evidence of it, what constitutes direct or indirect evidence, whether there's sufficient evidence of either, pro-competitive justifications, whether they're pretextual, and there's no need to then weigh the pro-competitive justifications against the alleged anti-competitive effects. That's all necessary only if this court is analyzing the alleged restraints under the rule of reason or if it's considering the attempt of monopolization claim as if it were an actual monopolization claim. All that falls away under the narrow, discreet legal issues that I'm Well, you say narrow, but the problems with your narrow approach is limiting the application of this case. I mean, as I read the briefs and as I read what DHL is alleging, you've basically described the entire medical community in Mississippi, where I'm from. In other words, most of even the biggest towns in our state might have one or two hospitals, a couple of physicians groups, and basically, any time one physician group or individual physicians, I guess, if they're like the Saguaroas, change hospitals or decide they're going to use admitting privileges over here and not over there, we've got an antitrust case. So I don't think that's what we are saying needs to happen here. No, I know that's not what you're saying happens here, but if we decide the case in your narrow approach, it's going to happen everywhere. Is it not? I do not think so, Your Honor. Could Laredo Medical Center have sued DHL and the Saguaroas before the Saguaroas left for anti-competitive monopolization or anti-competitive behavior? No, I do not think so, Your Honor. How much market share did DHL have before they left? I'm not sure what the exact percentage is. It was pretty high, though, wasn't it? Because five of the six or so cardiologists in Laredo were at DHL? Yes, Your Honor. So what protects DHL from having the exact same claim, the mirror image, brought against you successfully? Because that is focusing only on an exclusive supply agreement, which is only vertical. If you're only looking at a vertical arrangement, only in isolation, not looking at horizontal agreements between competitors, including threats to prevent that competitor from getting doctors or other inputs to their business, looking at it in isolation, that would usually be subject to rule of reason analysis. But here, the district court found there's direct evidence of a horizontal conspiracy between admitted competitors. So the Saguaroa Institute and Laredo Medical Center are admitted competitors in outpatient interventional services. They admit that. The district court found that. There is evidence of them conspiring to foreclose a rival plaintiff's, DHL, from the market, doing that in part through vertical elements, not a limited issue. When the Dr. Saguaroa left DHL or said, we're not going to refer anybody anymore, we're going to go to Laredo Medical Center, I mean, the Institute is their entity, right? I mean, so does that just get swept up because those individual doctors decided we're going to use admitting privileges at our rival hospital? I mean, again, what's the limiting principle of this? The limiting principle is that the Saguaroa Institute is an entity, and it competes for outpatient interventional cardiology services. What evidence is there that the entities, LMC and the Institute, actually did this horizontal conspiracy that doesn't include statements by Dr. Saguaroa I or Dr. Saguaroa II? I don't know how an entity could make statements other than through the people who control it. But that's sort of my point. Is the doctors who are making individual practice decisions, and it's sort of by nature that their Institute's going to go the same direction? Or is it just that whoever is the loser of this transaction gets to say, look, look, horizontal conspiracy, because even though this is driven by the individual doctors changing where they're going to refer patients or use their privileges, they have an entity, and so therefore, horizontal conspiracy, per se. That is, the district court found there's direct evidence of a conspiracy between the Saguaroa Institute and Laredo Medical Center. The hypothetical situation where a doctor happens to change where their admitting privileges are being used is not the situation we have here. This is not in isolation a doctor making a move. This is two institutes who are horizontal competitors. They have direct evidence of a conspiracy between them for a group boycott. Group boycotts, horizontal group boycotts, are subject to per se liability. And it wasn't just this arrangement either. It was also the threats to Dr. Feldman to prevent him from coming to Doctors Hospital Laredo. That is part of the horizontal conspiracy. You can't view it in isolation where you look at just an exclusive supply agreement. Exclusive supply agreements in isolation are usually subject to rule of reason. This is a horizontal agreement that is enacted in part through vertical aspects. And under M.M. Steele, even though there are some vertical aspects, that doesn't negate the per se aspects of the horizontal conspiracy. The horizontal conspiracy maintains its per se character whether or not there are also vertical aspects to it. What M.M. Steele does, and this is, I think, part of what the district court misunderstood and what defendants misunderstand, is that M.M. Steele doesn't condition whether a per se rule applies to the vertical aspects. It simply says that in some situations, the vertical participants join the horizontal conspiracy for per se liability purposes. It is not changing whether the horizontal conspiracy is still per se. It's always per se, which means that it has to be analyzed under the rule of reason. Now, the defendants have the opportunity in front of a jury to argue that this conspiracy is not what it seems, that this conspiracy didn't happen, but there's a fact issue on that, and that's for a jury to resolve. So what's the answer, practically speaking, what's the answer? I mean, the district court, one of the things the district court said that sticks with me is the only way DHL wins here is basically to say, Sigaroas, you can never leave. Hotel California, you can check out anytime you want, but you can never leave, or else we're going to have these cases. Not what's required here, Your Honor. What is required? That they stop practicing? No, it is not. They close their institute. What they can't do is switch to another practice through a horizontal agreement to boycott a competitor using, in part, threats to stop them from getting other doctors to compete with them. That is almost exactly what happened in M.M. Steele, and in other cases like floors that have vertical participants helping to enforce a boycott among competitors. It is not that someone is unable to, in a vertical relationship, change where they work. It's that you can't do it as part of a boycott of a competitor. You can't do that using horizontal agreements. If the market, tell me if this is wrong. If the market saw increased capacity, no price increase, no monopolization, what is your best evidence to show harm to competition rather than harm to DHL? Well, a couple things, Your Honor. The main thing is that for per se liability, you have a horizontal agreement between competitors, and per se applies to several narrow situations, price fixing, market allocation, horizontal group boycotts. In those situations, we do not look at anti-competitive effects. We do not look at alleged pro-competitive justifications. These situations always, or almost always, tend to restrict competition. If we apply the rule of reason, you lose. No, Your Honor. I do not think that's true. But the evidence, as I apprehended it, and you know the record better than I do, but the evidence is all of exactly what Judge Willett just asked you. More competition, more doctors providing this care, more venues in which to get the care, because then you went from DHL providing it to DHL, the Institute, and LNC. If you look at the rule of reason, clearly what has happened here is competition has increased. DHL may not like it because it didn't have as much competition before, but we're looking at a situation where the only way you get to where you want to go is per se and not the rule of reason, which is why this is being shoehorned into a horizontal boycott. I disagree, Your Honor. Well, I understand you do, but I'm just trying to get it. That's the reality of what we're looking at, though. Competition has been enhanced in Laredo for this service. So there's several reasons why I think that's inerrant. One, we dispute that on the facts that it is true that competition has improved, that output has increased. That is a disputed fact issue on output. Well, but you've got to show anti-competitive effect to competition, not to DHL. Yes, and we have evidence, our experts opine, that output actually decreased. Now, we dispute that fact, but that's a disputed fact on output, and that is an anti-competitive effect. But we don't actually need to get to direct evidence of anti-competitive effects, which are very difficult in any case to have. Under the per se rule, you're not supposed to look at this because these types of arrangements, whether they actually impact the market much or at all, is not what we want to look at. And attempted monopolization claims is a similar situation. We don't reward those who attempt to monopolize but fail. I think that there are a couple cases, such as Kluwer's, that really makes clear that even in that situation, there was only one participant in the market who was allegedly excluded. And the court still applied the per se group boycott rule because it didn't matter that competition otherwise thrived because you're not allowed to do per se group boycotts. Whether it actually results in anti-competitive effects doesn't change that. Same thing with multi-flex, which is an attempted monopolization claim, where it said that you don't actually need to cause actual effects in the market. I think the exact quote is, the offense of attempted monopolization need not cause actual market damage. So it's really like a non-segwit or a red herring to say that for either of our claims, we need to show this. But we do have disputed evidence, and we briefed this. You can see it in our briefing that we address what we say is the evidence of anti-competitive effects. But we don't need to get to those because this is a per se claim and an attempted monopolization claim. Under both of those, we don't want to give defendants an out because they tried to monopolize, but they just happened to not get there. That encourages monopolization attempts because if you fail, you can't be charged with a monopolization crime or civil liability, that is. And if you succeed, you're a monopolist. You get your super competitive profits, and good for you. Same thing with per se liability. Per se rule exists because as a class of agreements, courts have decided that these just are not tolerable, whether they have large enough effects in the market to either be measurable because they just aren't competitive. So very briefly on this, I think that it's important to note that the district court was analyzing only the alleged vertical aspect of the agreement when it said that there are pro-competitive justifications. And that really gets the analysis backwards. It didn't engage with any of the horizontal aspects of it. It never said, well, here are pro-competitive justifications for the threats to Feldman. It actually said there were no pro-competitive justifications for the threats to Feldman and never analyzed the horizontal. The threats to Feldman, Feldman couldn't do what DHL wanted him to do. And there's evidence, there's certainly evidence that maybe it's disputed, but Dr. Seguroa was saying that. We don't need him to come here because basically he's going to put the patient's lives in Laredo in danger. He wasn't qualified to do a structured cardiac program. So structured cardiology, I think, again, it's still disputed. It's disputed evidence, and this is summary judgment appeal of whether there was a structured cardiology program that would have been able to basically been brought to work. But that was the substance of the complaint. What evidence contradicts that complaint? Because he was not just going to provide structured heart care. He also was going to provide interventional cardiology services. And I don't think there's any dispute that he's qualified to do that. He was still going to be providing interventional cardiology services in the market. He was prevented from doing that. That has never been disputed. What's disputed is whether their structural heart program was going to get off the ground. That's still a fact issue. It's separate from whether there is basically an input to your business that is being blocked by a horizontal group boycott from. But they found other inputs. They hired other cardiologists. The evidence shows other cardiologists came to Laredo at DHL's recruitment. But that doesn't change the per se nature of a violation. It doesn't change that it's anti-competitive. It's the determination that we have vertical agreements between the Siguroas and LMC versus horizontal. In other words, if it's mixed. The district court said what really predominates here is the vertical arrangement, the nature of the individual doctors going over. What kind of finding is that? Or what kind of determination is that? I see I'm about out of time. Can I finish and answer your question, Your Honor? So that, I think, was the court balancing the importance of vertical versus horizontal. But nowhere in the case law, nothing in M.M. Steele says that balancing is how you determine whether a horizontal agreement is subject to per se liability. But whether an agreement is horizontal versus vertical, that's the determination I'm asking about. I think whether an agreement is horizontal or vertical, it could be a mixed question of law and fact. It depends on the issue. But what the court was looking at was only the vertical aspect, not the undisputed horizontal, which the court admitted right before it analyzed the only exclusive vertical aspect. It said there are horizontal aspects to the agreement. And, Your Honor, I'm out of time. OK. We'll see you back on rebuttal. You've reserved five minutes. Who's first, Mr. Powers or Mr. Munisteri? OK. So 10 and 10 is your split? That's correct, Your Honor. OK. May it please the court, Jason Powers here for Dr. Siguroa and the Siguroa Heart and Vascular Institute. The question before the court today is whether the plaintiffs raised a fact issue on competitive harm. And the bottom line is that the market is more competitive today than it was before. Prices didn't go up. Quality didn't fall. More doctors are seeing more patients at more facilities today. Well, you heard this from counsel opposite. If it's a horizontal agreement between the Institute and LMC, none of that matters, because it would be per se illegal. That's the argument he's made, Your Honor. And I can understand why they want to try to go to the per se rule. Well, I understand that. I understand why they want to go there. But you need to tell me why we shouldn't go there. Because, I mean, it is one of these things, the Dr. Siguroa took their marbles and went elsewhere. But there's a lot on the record that says we're going to take everything from them. They're incompetent. We're going to get 90%. I mean, it sure sounds like what they're doing is agreeing when they are competitors. So explain it. Right. So let's talk specifically about the application of the per se rule. So DHL's position is that if you have any agreement between horizontal competitors, if that is a per se illegal group boycott, the US Supreme Court has said exactly the opposite in terms of how you analyze whether a group boycott is subject to the per se rule. It's the Northwest Wholesale Stationers case, Your Honor, where the Supreme Court identifies three characteristics of group boycotts that would be subject to per se treatment, and only three. Those three are, one, the boycott cuts off access to a resource that is necessary for the boycotting firm to compete. Number two, the boycotting firms have a dominant position in the market, meaning they have market power. And third is that the practices at issue would not be justified by plausible pro-competitive effect. Well, do we have a horizontal agreement here? Do you agree with that? We have a mixed relationship here, Your Honor, because the- Well, but is it fairly characterized as horizontal agreement between the Institute and LMC? I think it is not in this case, Your Honor. How do we make that determination? Well, there's two reasons. Number one, as you pointed out, the district court found that the predominant nature of the relationship between Dr. Siguroa and the hospital is a vertical one, and that's based on a consideration of what is the more relevant commercial participation here. All right, but this is summary judgment, so we're viewing it de novo. How do we make that determination? And I think in this case, we look exactly at what the evidence was that there is a relationship between them. The point at which this conspiracy supposedly forms is when a vertical relationship is established between them. In other words, there is no horizontal piece of this conspiracy. It is a conspiracy that is born of a vertical relationship. And because it has both a vertical and horizontal aspect, it can't be subject to the per se rule. But I guess I'm asking the inverse of what I was asking your friend opposite, which is if the Siguroa has run the Siguroa Institute and basically what they say is going to be what the Institute says, how are we to separate the horizontal aspect of this from the vertical aspect of this? Right, and that is one thing that this court has said repeatedly you don't need to do. What you do is you apply the Northwest wholesale factors. I particularly would direct your attention to the Tunica web advertising case. That's a case in which the Court of Appeals remands the question of per se treatment for an alleged group boycott down to the district court and instructs the district court, don't get hung up on the horizontal or vertical aspect of this. Instead, look at the three-factor test for Northwest wholesale and ask, did this boycott cut off access to something the competitor needed in order to compete? Was there market power that was being exercised and were the practices justified by plausible pro-competitive effects? That third element is the one that is especially pertinent where you've got a partly vertical relationship. Because whenever there's a partly vertical relationship, there would be plausible pro-competitive benefits. And in this case, there certainly were because in order to get this relationship off the ground, Dr. Siguroa goes to LMC and says, you need to be a better competitor. You need to have more facilities. You need to build a new lab. You need to hire more people. You need to upgrade your position. And you need to get into a position where you can perform surgeries that currently you can't. And because he establishes that relationship, there are now more facilities in Laredo that are providing care. There are two surgical options where once there was only one. There are more jobs for nurses and technicians, and they're getting paid more because Dr. Siguroa went to LMC and said, I'm going to have to compete with DHL because they have changed their relationship with me. And in order to compete in this market, you need to be a more serious competitor than you are today. Now, what Plainter's trying to do is trying to argue that M.M. Steele settles the per se question based on the notion of mere horizontality or verticality. I suggest, Your Honor, that is not what M.M. Steele actually did. When you read Judge Higginson's opinion in M.M. Steele, he quotes the three-part test from Northwest Wholesale Stationers and says, that's how we decide whether or not this is one that the per se rule would apply to. And he simply says, the first part of Northwest Wholesale was satisfied in that case. He says in the very first paragraph of the opinion, he says, the defendants conspired to deprive the plaintiff of any steel plate to sell. They succeeded, and the plaintiff went out of business. They actually did deprive the plaintiff of something that was necessary. How's that different than the defendants here conspiring to take 90 percent or take Dr. Santos and the nurses and the staff and all those sort of things and take it all from DHL? That may have been their intent, Your Honor, as described in some of their emails. But I thought that they said it. But they said it in emails to each other. They wanted to accomplish that. But as the U.S. Supreme Court said in the Spectrum Sports case, and as the D.C. Circuit case said in the Microsoft case, the fact that you intend to accomplish a monopoly doesn't mean that you have engaged in attempted monopolization, unless you actually have the power to create structural barriers that will be a barrier to competition. In this case, what was taking it all from them? Well, it was hiring Dr. Santos, who DHL didn't need because they'd already hired people to replace him and were getting ready to shove him off. They were going to try to hire nurses and technicians who had worked for Dr. Santos at DHL. And by the way, had worked for Dr. Santos when he was at LMC five years before that. That did not deprive DHL from the ability to be able to serve surgical patients. Well, I mean, it seems to me you're going to the results of what happened, but can't bad monopolists be still culpable for attempted monopolization? Attempted monopolization is something that can be prosecuted or can be... Well, I know, but I'm trying to plumb the lines of what is and what isn't. Right. And where the Supreme Court directs us in the Spectrum Sports case is to say, look, it is a question of degree. You have to introduce evidence that in fact the defendants are, I think they say, proximity to success. Like dangerously close or dangerous probability of success. That's how they're trying to flesh out the notion of dangerous probability. And the way they describe it is trying to show some kind of evidence that in fact, with this anti-competitive conduct, that would give the defendants the power to dictate... Yeah, but the Siguroas had like 70% of the market share, did they not? Or am I adding LMC in the Siguroas? You're adding LMC in the Siguroas. But does that matter? Because if they're the alleged conspirators, wouldn't 70% market share be pretty close to monopolization? Yeah, the question here, Your Honor, is what level of market share would be significant? And one thing that this court has said several times, most... Dome Stadium Hospital, that's right, Dome Stadium is probably the most relevant case on this, but saying, look, there's not a market share that is in and of itself legally significant. But how do we do this on summary judgment as a matter of law? You look at the market factors and you try to see, is there evidence, and the way the court put it in Dome Stadium, is there evidence that a particular market share would give the defendant the power to dictate price or prevent new entry into the market? In other words, market share is a fact that might be something that is pertinent to the discussion, but it doesn't carry the burden, because the burden is carried by demonstrating that, in fact, that level of share would be something that gives the defendant power here. Well, they surely scared at least one or two cardiologists away by expressing their opposition to their coming to Laredo. Isn't that at least evidence of ability to prevent market entry? The real question here is not whether he was able to exclude one competitor. The question is whether he was able to exclude competition, and this is where the economists report that DHL... Well, but you exclude competition by excluding competitors, and if they did it once, why couldn't they do it multiple times? And let's talk about Dr. Flum's report specifically on that point. When Dr. Flum says, you guys excluded Dr. Feldman, he then says, oh, yeah, but also all the procedures Dr. Feldman was going to do turned out being done by DHL anyway. He found no lost volume, no lost procedures, no increase in price. And why was that? Because Dr. Feldman was replaceable, and he was replaced. Dr. Solonga-Roglu came, despite the supposed blockade. Seven new cardiologists were practicing in Laredo during this so-called blockade conspiracy, and the two cardiologists that were already on the DHL staff remained on the DHL staff. In other words, DHL said that the competitive market, rather the pre-conduct market in 2020 had three interventional cardiologists on their staff. They've had nine since then. Scaring away Feldman was not enough to prevent DHL from being able to offer interventional cardiology services. And were they part-time or full-time? Sorry, Your Honor? You said they went from three to seven. When they went to seven, were some of them part-time, or were they all full-time? Dr. Solonga-Roglu was in for one week a month. He offered to come in for two weeks a month, and DHL said they didn't need him. Dr. Musa was full-time. Drs. Omar, Ahmadi, and Millican, I think were the other ones, were coming in periodically as locums doctors on a one-week-a-month type basis. Okay, Mr. Powers, thank you very much. Thank you, Your Honor. We appreciate it. Mr. Munasteri, welcome. Thank you, Your Honor. May it please the Court, James Munasteri on behalf of Laredo Medical Center, the other Laredo Medical Center entity which has been dismissed in this case, so I represent just LMC. I do want to make just a few comments at the very beginning regarding LMC in particular. In addressing the issues of vertical and horizontal, none of the communications discuss anything other than a vertical relationship. Dr. Siguro practiced at LMC for many years, and he left that hospital and went to DHL, where he had been. Essentially, what has happened is he shifted his preference back after eight years. That's why Dr. Santos, who had once been at LMC, went back to LMC, why some of the nurses went back. These were people in a small community, as Judge Wilson recognized, is fairly classic. At the same time, the only horizontal nature that exists relates to theoretical outpatient procedures, because all of those outpatient procedures are being done by Dr. Siguro at the Institute. There's no agreement by which any type of outpatient procedures were somehow allocated to LMC. The topic was not even discussed. This was a purely vertical relationship, where in order for Laredo Medical Center, as hospitals do all the time, to attract the best doctors, they were willing to make an investment and upgrade their cath lab, which they did. It came at a time when Dr. Siguro, as the court knows from the briefing, was experiencing, let's just say, a sense of not feeling exceptionally appreciated, and he made a choice. Doctors do this all the time, and the hospital competes in this community for physicians. And one way that hospitals compete hard is to offer better facilities, is to try to hire better people. It's a fluid labor market. And so the nature of this relationship was in no way a group boycott, or some sort of horizontal conspiracy. That's the situation where you have pure distributors, they're all on the same line of the sale process, and they have some reason, horizontally, to abide by an agreement. The only discussions here were purely vertical. Your best point seems to be, well you tell me, that there's no anti-competitive effect, but would you go even further and say, not only was there no anti-competitive effect, there was no anti-competitive conduct here? I would. I would say on the section two, and I'm gonna get to this in a second, there's no exclusionary conduct with respect to this notion of somehow preventing doctors from coming to Laredo, Dr. Feldman. The evidence is undisputed that even DHL contends that the conspiracy, if there was one, was with a Dr. Alan Anderson, who's not a party to this case. There's no evidence in the record that my client, and this is the record, my client, Laredo Medical Center, did not know about Dr. Feldman, or who he was, or that he was being recruited by DHL, until it got a copy of the complaint, in this case, in October 2021. It had no knowledge of Dr. Feldman. Really, when this case, I think this case can be, as all cases, can potentially be boiled down to two points. One is really at the core of this case is Dr. Feldman believing that he got somehow excluded through this threat that's alleged. And he may have had a direct impact. He didn't sue. The company, DHL, which is part of a huge hospital system, had an indirect effect, which is they hired a replacement. That's what this case comes down to. My client didn't even know about it. It happened, those events happened at the same time in the summer and fall of 2021. How much weight should we place on LMC's internal goal of reaching 90% market share and statements about taking everything from DHL? What kind of weight should we put on that? For purposes of this appeal, none. I mean, we're not contesting that the one of three elements, the intent element on section two, can be satisfied for summary judgment purposes with that evidence. And just because the court brought it up, the testimony was that the 90% was aspirational. That said, it's intent evidence, and we're not contesting that's the issue. The issue on section two has to do with two of the three elements, both of which relate to injury. Exclusionary conduct, and I want to, on that issue, note our position is not that it requires actual harm. You have to show potential market harm. And then the second issue is really where the record is just completely bare. There has to be evidence that the attempted monopoly, that the actual actors can achieve market power, meaning the ability to affect prices or to affect output, and impact consumers. And that overlays with the standing issue, which is a question of antitrust injury. So infused in three places is there standing, not Article III standing, but antitrust standing, as well as in section two, is it exclusionary conduct? Because you do look, and Judge Garza notes in Taylor Publishing, that you look at whether or not there is potential market harm to simply analyze if the conduct is exclusionary. If it is, you still go forward and look at the third element, which is, is there evidence in the record? And there's not. This expert could have done it. His report notes that there are ways to do it, but he does not project prices at all. He does not project outputs at all. He doesn't do what an economist does. And I thought one of the most telling statements in the appellant's brief was where they said the jury can make that conclusion. The jury is supposed to, in this case, determine whether there's market power and how that market power would affect pricing in outputs. This case is doomed by the lack of consumer impact. There is no evidence that any of the insurers or anyone from CMS or Medicare or Medicaid had any complaints or that prices are affected. Dr. Flum, a very, very well-credentialed expert for the plaintiffs, could have done the analysis that he normally does and projected where prices would go. But this record is replete. He doesn't explain why the prices are stable. He doesn't explain anything. The same is true with the patients. There are some scattered comments in the briefing about supposed patient harm, structural heart program. These people were four to six years away. Everyone agrees. Because you have to have a minimum number of procedures, interventional procedures, in a given locale in order to even apply for that application. The record shows Laredo doesn't have enough procedures. There were people in Laredo that could do the procedures. That's not the issue. And of course, as the court has pointed out, in question, Dr. Feldman didn't even do structural harm. Second, there's a comment about a death. And I thought it was really quite strong for the appellant to suggest that there was a death that resulted from this. Well, and the issue was the response times for STEMIs when someone's having a heart attack. And it does make a difference to get people to the emergency room quickly when they have a heart attack. But that case happened in late 20, early 2021 in the throes of COVID, months and months and months before the conduct at issue. There's no way that that is a market effect. It happened pre-conduct. You know, patient complaints. There's just the only thing at any time was even suggested below was, and it was rank speculation, was that if a patient saw locums, they might not see that doctor a week later. Well, Dr. Feldman was coming in one week a month. And also when you look at, and these are exhibits 97 and 98, and they're the charts of the various call coverages, the locums actually came in consistently. So the same, even like Dr. Musa, who was eventually hired full-time in August of 2023, he was locums for a while, but he kept coming in. This is a case where there is no consumer harm. It is a pure competitor harm case. And that issue goes to not just the lack of antitrust standing, but it also goes to the fact that there is not potential market harm and therefore not exclusionary conduct, as well as there's not the actual market power. And we ask that the court affirm. Okay, thank you, Mr. Munisteri. We appreciate it. Mr. Schemmel, you're back for five minutes. Thank you, Your Honor. May it please the court. I think you heard a lot of really great jury argument right there. But what we have here is an appeal on our summary judgment record. I think that there also were several important concessions made. They didn't concede that there's horizontal agreements here. They just don't want to focus on them. And nothing about the case law, nothing about M.M. Steele, nothing about any of the controlling binding precedent on how you analyze per se rule boycotts turns on whether the court or an advocate thinks a different part of the agreement is, quote, more important. Horizontal agreements among direct competitors to boycott a rival is a per se violation. My friend over here started with Northwest Wholesale to, I think, try to say that the per se analysis essentially has to go through the rule of reason analysis to determine whether something is per se in the first place. And I guess the first thing to say is that M.M. Steele directly deals with Northwest Wholesale and says that Northwest Wholesale has no bearing, quote, no bearing on this type of arrangement. We have a horizontal group boycott enacted in part through vertical elements. Now, Northwest Wholesale, I think, is important if you read Northwest Wholesale, that Northwest Wholesale was dealing with a co-op, a co-op among wholesalers who were necessarily direct competitors who were grouping together to buy things at wholesale. But the co-op itself was not being challenged in that case. No one was saying that the co-op itself was a boycott or a horizontal agreement that violated the antitrust law. What was being challenged was an ancillary restraint that the co-op was imposing that had to do with disclosures, which makes sense if you have to bind together to finance and buy things as a group. But what was not an issue in Northwest Wholesale was the actual horizontal agreement itself, which is why some of the statements in Northwest Wholesale have nothing to do with this case, and M.M. Steele has already squarely resolved whether Northwest Wholesale applies in this case and how. There's also a concession that I heard about admitting that potential effects are all that are required for attempt of monopolization, and that's true. And what the district court didn't do, but what you heard defendants talk about was dangerous probability of success. The district court did not rule on the dangerous probability element. And that element, frankly, is really easily satisfied here because the paradigmatic evidence of dangerous probability is market share evidence. And there's no dispute that defendants have over 50% market share. Under a domed stadium, high market share, over 50%, would itself probably be enough. But we have more here. We also have evidence of high barriers to entry and high concentration. That is enough for the dangerous probability element. There's no need on summary judgment to resolve that fact dispute because market power, market share is a highly fact-based question. There's no reason to rule on that as a matter of law when the district court didn't rule on it either. The district court only ruled on the first element, the conduct element. Said there's no exclusionary conduct only because there were no actual anti-competitive effects. Defendants concede that's not the standard. That claim, therefore, needs to be reversed and remanded. The section one claim, I would like to point out that Clores, I think, really goes at the heart, the United States Supreme Court decision in Clores really strikes the heart of what defendants are saying here by pointing to what happened in the market afterwards. So it was undisputed in Clores that the agreement, that the group boycott agreement there impacted only one competitor and that actually competition in the market continued to thrive afterwards. The court said it didn't matter. That that type of activity, a group boycott, is, quote, not to be tolerated merely because the victim was just one merchant and that competition continued to thrive. So all the discussion about what actually happened in the market is irrelevant when you have a per se group boycott. And again, we have admissions that is a horizontal agreement. We have a district court factual finding that there is direct evidence of a horizontal group boycott and it's enacted through threats, which under both M.M. Steele and even cases like Microsoft's on the monopolization side say that threats like this are anti-competitive conduct that satisfies the conduct element of a section two claim and it is exclusionary conduct that also is part of what makes a group boycott unlawful. There also was, I think, a little bit of criticism of a lack of direct evidence. Again, direct evidence is not the only evidence that's allowed. Also can have indirect evidence and we've briefed that extensively. And I see my time's about to end up, so thank you, Your Honor. We ask that the court reverse their man, both hands, for trial, thank you. Okay, thank you very much. We appreciate the briefing and the argument from both sides. The court will stand in recess until, what, 1 p.m.? Tomorrow afternoon.